# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 11, 2011

## STATE OF TENNESSEE v. REGINALD MAURICE ADKINS

**Appeal from the Criminal Court for Davidson County**
**No. 2008-A-88      Cheryl Blackburn, Judge**

_____

**No. M2010-00694-CCA-R3-CD - Filed March 11, 2011**

_____

Following a jury trial, the Defendant, Reginald Maurice Adkins, was convicted of first degree felony murder, see Tennessee Code Annotated section 39-13-302, and attempted especially aggravated robbery, a Class B felony, see Tennessee Code Annotated sections 39-12-107(a), -13-403(b).  In this direct appeal, the Defendant contends that the State presented insufficient evidence to convict him of either offense.  After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Reginald Maurice Adkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; adn Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

On November 6, 2007, Jared Collins ("the victim"), a white male, was shot and killed outside a market located at 839 Dickerson Pike in Nashville.  In January 2008, a Davidson County grand jury returned a two-count indictment relating to the victim's death, charging that the Defendant, Brandy Lea Birdwell, and Darryl Dekezz Thompson committed the offenses of first degree felony murder and especially aggravated robbery.  The Defendant's

trial, which was severed from that of his co-defendants, was conducted on January 11-13, 2010.

Annthonett Bethea testified that, on November 6, 2007, she waited in her car while her son went into the market on Dickerson Pike. Ms. Bethea saw a white male get out of his vehicle and have a brief conversation with two black men, approximately between the ages of seventeen and nineteen, who had approached from the alley between the market and the liquor store. She said that the white male walked toward the liquor store and that the shorter of the two black men also proceeded toward the liquor store. Ms. Bethea recalled that the taller black male went to the white male's car, opened the driver's door, and began searching for something. She said that the white man then came back from the liquor store and saw the black man in his car.

At this point, all three men converged and had a conversation, although Ms. Bethea could not hear what they said. However, she witnessed one of the black men hold one side of the white man, while the other black man patted his body as if he was looking for something. She testified that she thought it was the shorter black male that was more aggressively touching the white man. She recalled that, when her son opened the door to get back in the car, she heard one of the black men say, "[G]ive me the damn money." Ms. Bethea also testified that she then saw that the shorter black man had a gun. She testified that she started moving her vehicle at that time because she was afraid.

After she drove out of sight of the altercation, she heard a gunshot. Ms. Bethea testified that, as she drove around the store, she then saw the two black males jump into the bed of a white pickup truck. She recalled that she had seen the pickup truck parked on the side of the market when she arrived. Ms. Bethea stated that she saw a white female driving the pickup truck and that the vehicle left the parking lot very quickly. Ms. Bethea testified that she went back to the front of the store to see what happened to the white male. She went into the market and saw that he had been shot in his lower back.

Tearra Mayfield testified that, on November 6, 2007, she went to the market at 839 Dickerson Pike with the Defendant, Darrell Thompson, and Brandy Birdwell. Ms. Mayfield said that the Defendant is her stepbrother and that they lived in the same household. She stated that the foursome, whom had been together since about 1:00 p.m. that day, went to the market in Ms. Birdwell's white pickup truck and that she sat in the front passenger seat while the Defendant and Mr. Thompson sat in the fold-out seats in the extended cab. Ms. Mayfield testified that she saw the Defendant with a black revolver in his pocket that day. She recalled that she heard the Defendant and Mr. Thompson say that they were broke and needed some money. She said that they were "talking foolishness" and that she assumed they were going to get money by robbing someone.

-2-

Before heading to the market, Ms. Mayfield, the Defendant, Mr. Thompson, and Ms. Birdwell were at Ms. Mayfield's grandmother's house, located on Pennock Avenue. According to Ms. Mayfield, the Defendant and Mr. Thompson saw some people, one of whom was the victim, leave from across the street. Ms. Mayfield said that the four of them then left to go to the market. She recalled that Ms. Birdwell parked on the side of the market and the Defendant and Mr. Thompson got out of the truck. Although Ms. Mayfield could not see what happened, she heard "some tussling" and then a gunshot. Afterward, the Defendant and Mr. Thompson got into the bed of the pickup truck and yelled at Ms. Birdwell to leave the parking lot. The sliding back window between the cab and the bed was open, and Ms. Mayfield heard the Defendant and Mr. Thompson laughing and giggling. Then, she heard the Defendant say, "[D]id you see what I did to the nigger." When the group got to Cedar Hill Park, Ms. Mayfield saw the gun again, still in the Defendant's possession.

Christy Dean testified that she was with the victim on November 6, 2007, shortly before he was shot and killed. She recalled that the victim came over to her house on Pennock Avenue to visit with her then-fiancé and that the victim said he was going to go to the market. Ms. Dean accompanied the victim and went to a flooring store near the market.

As Ms. Dean returned from the flooring store, she saw that the victim was out of his vehicle and was scuffling with two black men, who were between the approximate ages of nineteen and twenty-five years old. She said that the victim had one hand in his pocket and was fighting them with one hand. She testified that the two men kept hitting the victim but that eventually he was able to run toward the market. She testified that, when the victim opened up the door to the market, he was shot in the back. Although she did not see the shooter's face, Ms. Dean testified that the shorter black man fired the shot.

Ms. Dean stated that she witnessed a white truck approach from the side of the store and that the two guys jumped into the bed of the truck. She testified that the driver of the truck was a white female that she recognized as someone who had visited Ms. Dean's neighbor's house before. Ms. Dean also said that she identified the driver of the white truck in a photo lineup.

On cross-examination, Ms. Dean admitted that she had bought prescription drugs from her neighbor, Ms. Mayfield's grandmother. She also acknowledged that the victim was addicted to pills.

Officer Po Cheng, employed by the Metropolitan Nashville Police Department, testified that, as he was responding to another call around 4:30 p.m. on October 6, 2007, he drove by the market at 839 Dickerson Pike and was flagged down by a large group of people, who told him that someone had been shot. Officer Cheng said that he went inside the market

and located the victim, whom he described was "in bad shape." He recalled that the victim was making some gurgling noises and was not able to respond to questions.

Detective Paul Harris, of the Metropolitan Nashville Police Department, testified that he investigated the vicitm's homicide. Detective Harris recalled that, as a result of Ms. Dean's identification of the driver of the pickup truck, he obtained a search warrant for Ms. Birdwell's residence. As a result of the search, he obtained a Colt revolver. Detective Harris stated that the revolver was loaded with six live rounds. He testified that he also recovered a .38 caliber shell casing and an unfired round from Ms. Birdwell's bedroom.

Detective Harris stated that he interviewed the Defendant on November 13, 2007, and that the Defendant signed a Miranda waiver form. See Miranda v. Arizona, 384 U.S. 436, 479 (1966). Detective Harris recalled his conversation with the Defendant as follows:

> He indicated that he rode in the bed of [Ms.] Birdwell's truck with [Mr.] Thompson, which is a person he refers to as D throughout the interview, and [Ms.] Birdwell and [Ms.] Mayfield. He indicated that the four of them had been at a home on Pennock Avenue and they had been drinking and smoking weed and taking Ecstasy that day. And he indicated that the three of them, meaning the three other than him, [Ms. Birdwell], [Ms. Mayfield] and [Mr. Thompson], must have come up with some plan to rob that he wasn't aware of. And he was seated on [Ms.] Birdwell's pickup truck on the tailgate in the bed of it. He wasn't clear. But he was outside the truck, either on the tailgate or in the bed. And [Ms. Birdwell] got in the truck and started driving, following the victim. And [Mr. Thompson] got in the bed of the truck with him and [Ms. Mayfield] got in the front seat and they went to the market.

> [Ms. Birdwell] parked on the north side of the market, as opposed to the front of the market. And they got out of the truck, meaning he and [Mr. Thompson] . . . got out of the truck. And he indicated in his interview that it was his intention to go to the store, but he did not ever get inside the store. Instead [Mr. Thompson] started talking to the victim. He claimed he wasn't privy to what they were speaking about. He didn't know what they were talking about. But, nonetheless, they spoke. And then the victim walked away.

> Then [Mr. Thompson] went to the victim's—I believe it's a Toyota [F]our-[R]unner that was parked outside the market, as well, and [Mr. Thompson] started going through the victim's truck. He opened the driver's side door and [the Defendant] indicated he stayed on the side of the truck.

-4-

And [Mr. Thompson] indicated something to the effect of, come on, man, let's—I forget his exact quote—come on—he was encouraging him to some degree, come on, let's get this, let's do this, something along those lines. I forget his exact wording.

And the victim soon thereafter came outside and saw [Mr. Thompson] going through the victim's truck. The victim then confronted [Mr. Thompson] and they got into a physical scuffle, an altercation, about having seen him going through his truck, his own property. He indicated that [Mr. Thompson] and the victim scuffled and [Mr. Thompson] was trying to go through his pockets. This is what [the Defendant] is telling me in the interview. That [Mr. Thompson] was trying to go through his pockets. And then he indicated the gun that [Mr. Thompson] was carrying fell to the ground. And then he said [Mr. Thompson] picked it up.

. . . He indicated it was [Mr. Thompson] that possessed the weapon.

Detective Harris also testified that the Defendant told him the gun was Ms. Birdwell's and that it was registered to her mother. However, the Defendant acknowledged that his prints might be found on the gun because he had touched it previously.

Regarding the Defendant's height, Detective Harris testified that the Defendant is 5'5", while Mr. Thompson is 5'11".

Dr. Adele Lewis, an Assistant Medical Examiner for the State of Tennessee, performed an autopsy on the victim on November 7, 2007. She testified that the victim suffered a gunshot wound to his back and that the bullet fractured the victim's right tenth rib, traveled through part of the victim's right lung, went through his heart, and hit one of the arteries that supplies blood to the heart. She testified that she recovered the bullet from the victim's chest and turned it over to the police. Dr. Lewis testified that the victim's cause of death was a gunshot wound to the torso and that his manner of death was homicide. Dr. Lewis also said that the victim's toxicology report indicated that hydrocodone and methadone were present in his blood.

Felicia Evans, a crime scene investigator with the Metropolitan Nashville Police Department, testified that she arrived at the scene of the shooting at approximately 5:25 p.m. She recalled that she recovered latent fingerprints from the victim's 1998 Toyota Four-Runner, which "was found with the driver door ajar and various items of paper and stuff kind of strewn about." Ms. Evans stated that she also processed a white 1999 Ford Ranger pickup truck that belonged to either Ms. Birdwell or her mother. In the Ford Ranger, she found a

black purse with two cartridge casings inside, a cartridge casing in a compartment on the rear driver's side door, and two .38 caliber cartridge casings in the center console.

Special Agent Shelly Betts, employed by the Tennessee Bureau of Investigation, testified she examined the bullet recovered from the victim's chest and determined that it had been fired from the Colt revolver recovered at Ms. Birdwell's house.

Belinda Shea, a latent print examiner for the Metropolitan Nashville Police Department, testified that she examined the fingerprints collected from the victim's automobile and matched Mr. Thompson's fingerprints to the ones recovered from the outside of the driver's door. Ms. Shea stated that she matched fingerprints from the Defendant, Ms. Birdwell, Mr. Thompson, and Ms. Mayfield to latent prints recovered from Ms. Birdwell's white pickup truck. She also said that she examined the prints from the weapon recovered from Ms. Birdwell's home but that the prints could not be identified due to a lack of ridge detail.

Tewodros Tashu, a clerk at the market where the victim was shot, testified that, around 4:30 p.m. on November 6, 2007, he looked outside and saw three people—two black and one white—struggling. He was not sure whether they were fighting or playing, so he started to go outside to get a better look. He described what he saw when he opened the door: "I see that it was a serious fight. And one of them tried to come into the store. So I opened the door for him when I realized that it was a serious fight, somebody was trying to hurt someone." Mr. Tashu testified that, when he opened the door, the victim started to come into the store. At that point, Mr. Tashu heard gunfire and saw the other two men run toward the side of the building. Mr. Tashu took the victim back into his office, at which time the victim said, "[C]all the police, this is the only money I have. Please help me, help me, this is the only money I have. Please call the police."

The Defendant, twenty-one years old at the time of the trial, testified that, on November 6, 2007, he "was on weed, drinking alcohol heavily and popping Ecstasy." He described that he "was real drunk" and "blank[ed] in and out." The Defendant stated that he, Mr. Thompson, Ms. Birdwell, and Ms. Mayfield went to the market to get orange juice to mix with vodka. He recalled that they saw the victim, whom he claimed owed Mr. Thompson money for drugs, and that Mr. Thompson wanted to talk to the victim. He recalled the victim said he did not have any money and Mr. Thompson went into his vehicle and "told him he was going to take something for collateral until he get his money." The Defendant stated that, when the victim came back and saw Mr. Thompson in his car, they got into an altercation. The Defendant testified that he did not touch the victim. According to the Defendant, Mr. Thompson had the gun and shot the victim.

The jury found the Defendant guilty of first degree felony murder and attempted especially aggravated robbery. The trial court sentenced him to consecutive terms of life imprisonment for his first degree felony murder conviction and twelve years, as a Range I offender, for his attempted especially aggravated robbery conviction. The Defendant now appeals.

**Analysis**

In this appeal, the Defendant argues that the State presented insufficient evidence to convict him of attempted especially aggravated robbery and first degree felony murder. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . ." Tenn. Code Ann. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a); see also Tenn. Code Ann. § 39-13-103 ("A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property

without the owner's effective consent."). "Especially aggravated robbery is robbery . . . (1) Accomplished with a deadly weapon; and (2) Where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). As the Defendant was convicted of attempted especially aggravated robbery, we note that our criminal attempt statute, codified at section 39-12-101 of the Tennessee Code Annotated, states as follows:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
>
> (b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.
>
> (c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

The Defendant argues that, because the victim owed Mr. Thompson money, the attempt to obtain money from the victim was "an attempt to collect a debt and not a robbery." However, the Defendant fails to acknowledge that, even if the victim did owe Mr. Thompson or him money, he had no right to rob the victim in order to collect the debt. See State v. Smith, 751 S.W.2d 468, 470 (Tenn. Crim. App. 1988) ("[A]ssuming arguendo that [the victim] owed the defendant some money over the rental transaction, this would merely be a civil obligation to be settled in a civil proceeding. Certainly, a person has no right to rob a person at gunpoint in an attempt to collect money that he may believe is owed to him."); see also State v. Maurice Leonard, No. M2006-00136-CCA-R3-CD, 2007 WL 957199, at *2, 4 (Tenn. Crim. App., Nashville, Mar. 27, 2007) (noting that the defendant's argument that he was simply collecting a $100 cocaine debt, rather than committing attempted robbery, "ignores established law that one may not collect a debt in this state, regardless of its legitimacy, by force or violence"); State v. Anthony Murff, No. W2001-01459-CCA-R3-CD, 2002 WL 1284296, at *7 (Tenn. Crim. App., Jackson, June 11, 2002) ("[T]he amount of money the victim may have owed the defendant has no bearing on the defendant's conviction

-8-

for especially aggravated robbery. The manner in which property is taken, rather than to whom it lawfully belongs, is the issue in robbery offenses.").

We conclude that the State presented sufficient evidence for a jury to convict the Defendant of attempted especially aggravated robbery and first degree felony murder. Before we summarize the proof, we note that, as the witnesses differentiated the two black men involved in the shooting as the "taller one" or the "shorter one," the Defendant is 5'5" and Mr. Thompson is 5'11". Additionally, the Defendant admitted to being at the market and interacting with the victim at the time of the shooting.

The proof established that Mr. Thompson went to the victim's car to look for collateral for an alleged drug debt. Soon after, Ms. Bethea witnessed him and a shorter black man hold and pat down the victim. She testified that the shorter black man touched the victim more aggressively than the taller man. Moreover, she heard one of the men say, "[G]ive me the damn money." Mr. Tashu described that the three were engaged in "a serious fight." Ms. Dean testified that she witnessed the victim being hit by the two black men. After the victim was shot, Mr. Tashu heard him say, "[C]all the police, this is the only money I have. Please help me, help me, this is the only money I have. Please call the police."

The Defendant did not dispute that he was there when the victim was shot, but he claimed that Mr. Thompson fired the gun. However, testimony from Ms. Bethea and Ms. Dean indicated that the Defendant, the shorter of the two black men, fired the shot that killed the victim. Moreover, Ms. Mayfield, the Defendant's stepsister, testified that she was with the Defendant, Mr. Thompson, and Ms. Birdwell at the market. She said that she saw the Defendant with a black revolver in his pocket that day. After the victim was shot, she said she heard the Defendant and Mr. Thompson laughing and giggling and that the Defendant said, "[D]id you see what I did to the nigger." Later, when the foursome arrived at the park, Ms. Mayfield saw the gun in the Defendant's possession.

Thus, the State presented sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that the Defendant shot and killed the victim in his attempt to perpetrate an especially aggravated robbery. The Defendant is not entitled to relief on this issue.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE